UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD LEE CARMICHAEL,

                          Plaintiff,

          v.

WILLIAM RILEY,

                          Defendant.

No. C06-5542 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  February 12, 2010**

          Before the Court is the motion for summary judgment of Defendant William Riley.  Dkt. 111.  The court has carefully reviewed the motion, Plaintiff's response (Dkt. 112), Defendant's reply (Dkt. 114), and supporting declarations and summary judgment evidence.  Viewing the evidence in the light most favorable to Mr. Carmichael, the undersigned recommends that Defendant's motion for summary judgment be denied as there are genuine issues of material fact remaining as to whether Defendant Riley, with deliberate indifference to Mr. Carmichael's safety, disclosed to officials at the Nevada Department of Corrections (NDOC) and other inmates, a false story that Mr. Carmichael was a Washington Department of Corrections (WDOC) informant with a history of living in "protective custody."   The undersigned recommends further that Mr. Carmichael request for injunctive relief for a transfer by the WDOC should be dismissed as the WDOC no longer has authority to transfer him.

REPORT AND RECOMMENDATION - 1

# BACKGROUND

Mr. Carmichael is an inmate at Ely State Prison (ESP) in Nevada. Dkt. 112, p. 1. Mr. Carmichael was formerly incarcerated with the WDOC, but has been paroled from those sentences. Dkt. 95. He is currently serving sentences in Nevada and it is unknown when he will be released from that state's custody. *Id.*

In his Second Amended Complaint, Mr. Carmichael alleges that Defendant William Riley violated his Eighth Amendment rights by spreading rumors that Mr. Carmichael was an informant with a history of protective custody status. Dkt. 66, pp. 8, 11.[1] Plaintiff also alleges that Defendant Riley's purpose in spreading such false information was to destroy Mr. Carmichael's reputation and influence and to place Mr. Carmichael's life in danger of assault and/or murder, and that this was done with the malicious intent to cause him harm. *Id.*, p. 9. Mr. Carmichael maintains that he has never been an informant or cooperated against others in any way and was never sent out of state for protective custody reasons. *Id.*, p. 8.

In addition to compensatory damages of $500,000.00 and punitive damages of $100,000.00, Mr. Carmichael seeks a declaration that the acts and omissions of Defendant Riley violated his constitutional rights. *Id.*, p. 18-19. Mr. Carmichael also seeks a permanent injunction (1) enjoining Defendant Riley from overseeing, participating in, or discussing Plaintiff or his history with any correctional staff or officials within or out of the State of Washington DOC; (2) an order directing the Washington DOC to transfer him to another state where he can program in a general population setting; (3) an order directing the Washington DOC to provide an official declaration that Plaintiff has never been an informant for the DOC, has never been

---

[1] Plaintiff moved for and was granted a voluntary dismissal of his claims against Defendants Bohon, Thatcher, Lucas and Miller. Dkts. 104, 106.

REPORT AND RECOMMENDATION - 2

known to cooperate against other prisoners in any way, and that the months he was placed in administrative protective custody in 1983 was "concluded as part of an escape plot." *Id.*

Defendant Riley moves for summary judgment on the grounds that (1) Mr. Carmichael has failed to produce sufficient evidence that Mr. Riley spread rumors that Plaintiff was an informant and has failed to show an "actual injury"; (2) Mr. Carmichael's request for injunctive relief is moot as he is no longer in Washington DOC custody; and (3) Defendant Riley is entitled to qualified immunity.

Mr. Carmichael does not oppose the motion for summary judgment as to his requested transfer by the WDOC as he has been paroled from the WDOC and it no longer has the authority to transfer him. Dkt. 112, p. 2; Dkt. 111-2, p. 10 (CM/ECF page numbering)[2]. However, Plaintiff opposes the remainder of the motion and argues that injunctive relief remains appropriate as to Defendant William Riley. Dkt. 112, p. 2.

## EVIDENCE PRESENTED

William Riley has worked for the Washington Department of Corrections for 22 years and is a Correctional Investigator. He works for headquarters investigating Security Threat Groups or prison gangs. Dkt. 111-2, p. 33. He has been investigating a group known as the Aryan Family since 1996 and during that time has received information regarding that gang from staff, investigators and inmates. Dkt. 111-2, p. 34. According to Defendant Riley, the Aryan Family is a prison gang that advocates lawlessness and violence within the prison setting, has only Caucasian members, is considered a white supremacist gang, and recruits exclusively in prison. *Id.*, pp. 34-35. Defendant Riley testified that he believed Richard Carmichael was the "founding member" of the Aryan Family. *Id.*

---

[2] All citations herein refer to CM/ECF page numbering.

REPORT AND RECOMMENDATION - 3

Mr. Carmichael admits that he was the founding member of the Aryan Family. Dkt. 113, p. 10. However, contrary to Mr. Riley's opinion, the plaintiff testified that the purpose of the Aryan Family it to try to educate young people about their identities and the wrong path of taking extreme racists views, to encourage education and becoming productive members of society after prison. Dkt. 113, p. 9.

Mr. Carmichael has been housed with the Nevada DOC since March 2000 except for the first five months in 2008, when he was in Shelton for his parolability hearing. Once the hearing concluded, he was transferred back to Nevada. Dkt. 111-2, pp. 10-11.

In 2004, Defendant Riley became aware that the Aryan Family was plotting to assault a staff member at the Washington State Penitentiary at Walla Walla. Dkt. 111-2, p. 35; Dkt. 113, pp. 47-48. According to Defendant Riley an assault on a guard was "out of the ordinary for Washington" and "exceptional." Dkt. 113, p. 49. In April or May 2004 (see Second Amended Complaint, Dkt. 66, p. 9), when he was in Nevada, Defendant Riley met with Mr. Carmichael and asked if there "was anything he [Carmichael] could do to call his boys off so we didn't have any staff assaulted." Dkt. 113, pp. 47-48. According to Mr. Riley, Mr. Carmichael was surprised to hear of the planned assault and said that it was an independent action and he didn't know about it. *Id.*, p. 48. Riley testified further that he believed Mr. Carmichael was being truthful when he said he didn't have anything to do with the planned assault. *Id.*, p. 49.

Sometime during his investigation of the Aryan Family, which he has been investigating since 1996, Mr. Riley learned that Mr. Carmichael had been in protective custody while in

REPORT AND RECOMMENDATION - 4

Washington State custody. Dkt. 111-2, p. 35. It is undisputed that Mr. Carmichael was placed in protective custody in Washington in 1983 as part of his escape plan. Dkt. 66, p. 6.[3]

After learning of Mr. Carmichael's former protective custody status, Defendant Riley contacted Daniel Clark, an investigator at ESP, to advise him of Mr. Carmichael's former protective custody and to ask "if there had been any issues as a result of that status." Dkt. 111-2, p. 36. In his declaration, Defendant Riley states:

> Once I learned of Mr. Carmichael's former protective custody status, I contacted the investigator at his Nevada institution to ask if he was aware of the protective custody status and if there had been any issues as a result of that status. The investigator, Daniel Clark, indicated that he was not aware of that previous status and stated they did not have any current issues regarding Mr. Carmichael's protective custody status. I expected that the information would likely be shared with other staff to protect Mr. Carmichael and that staff would not further disseminate the information to any inmates.

Dkt. 111-2, p. 36.

In his deposition, Defendant Riley testified to the following regarding his reasons for telling Daniel Clark about Mr. Carmichael's previous protective custody status:

> Q    Did you report to Mr. Clark that Mr. Carmichael had had protective custody in Washington?
> A    I told Mr. Clark that at one time early in Carmichael's inmate career, he had a brief stint in protective custody, yeah.
> Q    Why did you tell him that?
> A    Because we were exchanging information.
> Q    Why did he need to know that?
> A    Why did he need to know that? Because we were talking about the Aryan family.

---

[3] In early 1983 while he was incarcerated at the Monroe State Reformatory, Mr. Carmichael planned an escape by leading officials to believe his life was in danger in the general population so that he would be placed in protective custody status pending investigation. Dkt. 66, pp. 6-7. Mr. Carmichael told several prisoners what he was doing beforehand and after he was in protective custody for a few months, those prisoners went to prison officials and advised them that the information about Mr. Carmichael's life being in danger was a misunderstanding. *Id*., p. 7. After he was released to general population, Mr. Carmichael arranged for an associate to stab him in the stomach. *Id.* When he was transported to the hospital, Mr. Carmichael escaped with the aid of outside associates. *Id.* After his escape, Mr. Carmichael went to Nevada where he killed two people. Dkt. 111-2, p. 8. He is currently serving time in Nevada for two counts of second-degree murder. *Id.*, p. 7.

REPORT AND RECOMMENDATION - 5

Q        How is that relevant to the Aryan family?
A        I was looking at Mr. Carmichael's leadership abilities.
Q        And how was his stay in protective custody pertinent to his leadership
         abilities in the Aryan family?
A        You talked just a little ago about perceptions of inmates being in
         protective custody, is that a good thing or a bad thing. That's it.

Dkt. 113, pp. 45-46.

The discussion of "a little ago" referred to by Defendant Riley is as follows:

Q        When is it safe for a prisoner to go into protective custody without
         endangering the ill will of the prison population?
A        I think that's a speculative question. It's all based on that individual's
         needs.
Q        If an individual were to go into protective custody because they were an
         informant, would the prison population, generally speaking, have a
         response which would threaten the safety of that individual?
A        Only if they found out he was an informant.

Dkt. 113, p. 44.

Plaintiff alleges that Defendant Riley coupled reports of Mr. Carmichael's stay in

protective custody with false reports that he was an informant for the DOC and that Mr. Riley

told numerous Washington prisoners that Mr. Carmichael was an informant in an effort to

discredit his leadership.

Clark Stuhr, an inmate in IMU at the Walla Walla State Prison, was deposed in this

matter. He testified that he last spoke with Mr. Riley sometime in 2003. Dkt. 114-2, p. 28. It

was during this last meeting that Mr. Riley "indicated with innuendoes" that Mr. Carmichael had

debriefed (become an informant) and also stated that James Curtis had in fact debriefed. *Id.,* pp.

9-10. Mr. Stuhr denied telling any other prisoners about the allegations of Mr. Carmichael being

an informant as his own investigation proved to him that the assertion was not true. He saw

some paperwork that James Curtis received from INI (internal investigations) which was

produced as a result of a public disclosure request. That paperwork stated that both Clark Stuhr

REPORT AND RECOMMENDATION - 6

and Richard Carmichael had "given up known AS members." Since Mr. Stuhr knew he had not done so, he concluded that it was also not true regarding Mr. Carmichael. *Id.*, p. 29-30. It is also Mr. Stuhr's testimony that the head of INI is the defendant, William Riley. Mr. Stuhr was also suspicious of the paperwork:

> Yeah, you know, when you do a public disclosure like that, when they give you paperwork like that, they are supposed to mark off all the names, are supposed to black them out, and then they're supposed to photocopy them and then send it to you, so that way you can't hold it up to the light and see the name under the blackout.

> With this paperwork, they didn't do that. They lightly went over the names and then gave it to him. They gave him the original.

*Id.*, pp. 11-12.

Mr. Stuhr confirmed, based on his twenty-one years in prison, that a prisoner's life would be in danger if other prisoners discovered that an inmate had been an informant. Further, if that inmate is in protective custody because of his being an informant, the threat to that inmate's life only increases. Dkt. 113, pp. 58-59.

Mr. Riley met with Mr. Carmichael in Nevada sometime in April or May 2004. Shortly after that meeting he started hearing rumors that he was a snitch. An unnamed correctional officer approached Mr. Carmichael and asked him: "'Was you an informant from Washington?' You know, 'Was you in PC in Washington?'" *Id.*, p. 14. Mr. Carmichael asked the officer who told him that and in response was told: "Do you know Bill Riley?" *Id.*, p. 14. In addition to this information from the officer, Mr. Carmichael was told by prisoners that Mr. Riley had spread this rumor in Washington State. "Then rumors going all around the yard that this high-level investigator out of Washington State has revealed that I've been an informant for 20 years for the

Department of Corrections and that I was a PC case and that I was actually sent out of state for protective custody reasons." *Id.*, pp. 16-17.

Christopher Jernigan, a fellow inmate incarcerated at Ely State Prison in Nevada testified that rumors began circulating about Mr. Carmichael shortly after the contract prisoners from Washington State arrived in 2004. The contract prisoners "brought it to a few prisoners attention that a prisoner named James Curtis in Washington State had a web site going that claimed Richard, as well as other Washington prisoners were informants. This Curtis claimed he had been told by officials that Richard had been sent to Nevada for protective custody reasons, that he used to be a member of the Aryan Warriors[4], and had been cooperating with officials for years." Dkt. 113, p. 51. These same contract prisoners said that gang investigators in Washington had been spreading these rumors about Richard Carmichael to prisoners. *Id.* According to Mr. Jernigan, Officer Clark was telling inmates that the plaintiff was not all he claimed and "that investigators from Washington were telling him things about Richard." *Id.*

Mr. Jernigan also testified that in March 2005 some inmates obtained copies of what was written on James Curtis' web site which "did in fact say some very ugly things about Richard." *Id.*, p. 52.

Prior to the time he met with Defendant Riley in 2004[5], Mr. Carmichael lived in the least restrictive housing unit at ESP and had a job working in the laundry. Dkt. 113, p. 18. He enjoyed a good reputation among the prisoners. *Id.*; Dkt. 113, p. 51. In approximately March of 2005, NDOC Officer Clark advised Plaintiff that ESP officials had received information that the Aryan Warrior Gang had a "hit" out on Plaintiff. Dkt. 66, p. 9. On July 1, 2005, Mr. Carmichael

---

[4] It is undisputed that Mr. Carmichael has never been a member of the Aryan Warriors. Dkt. 113, pp. 23-24.

[5] Plaintiff's Amended Complaint places this meeting in May or April of 2004. Dkt. 66, p. 9.

REPORT AND RECOMMENDATION - 8

was removed from the general population at ESP and placed in "restricted housing," where he is locked down 24 hours a day, not allowed interaction with other people and not allowed to have a prison job to earn early release credits. According to the Warden of the ESP, Mr. Carmichael was placed in restrictive housing, "because it [was] believed that [his] safety would be in danger if placed in less restrictive housing." Dkt. 113, p. 62.

## DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In deciding whether summary judgment should be granted, the court must view the record in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id.*

The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which

REPORT AND RECOMMENDATION - 9

is "determined by the substantive law governing the claim." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290); see also *California Architectural Building Products, Inc.*, 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).

"A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

Basic and fundamental to any 42 U.S.C. § 1983 action is an inquiry focusing on whether the plaintiff has been denied a right of constitutional significance. *Parratt v. Taylor*, 451 U.S. 527, 532, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), overruled on other grounds; *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L Ed. 2d 662 (1986). The Civil Rights Act is not a font of tort law. *Parratt*, 451 U.S. at 544. The particular harm complained of must be scrutinized in light of the specifically enumerated rights and privileges protected by the United States Constitution. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).

**B.    Eighth Amendment Violation – Cruel and Unusual Punishment**

To state a claim under 42 U.S.C. § 1983: (1) the defendant must be a person acting under color of state law; and (2) his conduct must have deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt*, 451 U.S. at 535. Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87 (1977); *Flores v. Pierce,* 617 F.2d 1386, 1390-91 (9th Cir. 1980), *cert. denied*, 449 U.S. 875 (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must be dismissed.

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id*. at 833; *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005); *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982); *Gillespie v. Civiletti*, 629 F.2d 637, 642 & n. 3 (9th Cir. 1980). The failure of prison officials to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate safety. *Farmer*, 511 U.S. at 834; *Hearns*, 413 F.3d at 1040-41.

A prisoner may state a § 1983 claim under the Eighth Amendment against prison officials only where the officials acted with "deliberate indifference" to the threat of serious harm or injury to an inmate by another prisoner (see *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986); see also, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (deliberately spreading rumor that prisoner is snitch may state claim for violation of right to be protected from violence while in state custody). A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal

recklessness is met, *i.e.*, the official knows of and disregards an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id*. However, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *See id*. at 842.

On the basis of these standards, the court views the following evidence in the light most favorable to Mr. Carmichael.

Defendant Riley admits that he disclosed Mr. Carmichael's protective custody status to Daniel Clark, an investigator at the Plaintiff's Nevada institution. While he denies that he disclosed information about Mr. Carmichael to other inmates, Mr. Riley admits that he expected the information would be shared with other staff and that staff would not further disseminate the information to inmates. Dkt. 111-2, pp. 35-36.

On the other hand, Mr. Carmichael has produced evidence that Defendant Riley reported to NDOC officials and inmates of WDOC, that Plaintiff was an informant and that he had a history of protective custody status. Mr. Carmichael testified that shortly after Mr. Riley spoke with the plaintiff in Nevada, a NDOC corrections officer pulled him aside and questioned him about his history of protective custody and informant status. Dkt. 113, p. 14. The corrections officer indicated that this information came from Defendant Riley. *Id.* Christopher Jernigan, an inmate at ESP, stated that Mr. Carmichael's life was put in peril by widespread rumors that a WDOC investigator had told numerous Washington offenders (including James Curtis, who posted the information on his website), that Mr. Carmichael had been sent to Nevada for

protective custody reasons, he used to be a member of the Aryan Warriors, and that he had been cooperating with officials for years. Dkt. 113, pp. 51-52. Mr. Stuhr, a WDOC inmate at Walla Walla, testified that he saw papers in Mr. Curtis's possession from the INI stating that Mr. Carmichael was an informant for the WDOC. Dkt. 114-2, pp. 9-10. He also testified that Mr. Riley communicated to him that Mr. Carmichael was a "snitch." Dkt. 113, pp. 58-59.

According to the plaintiff's testimony, the Aryan Warriors at ESP learned of allegations they believe were supported by Washington officials that Mr. Carmichael was a PC case and an informant from Washington and this placed Mr. Carmichael's life in danger. Mr. Carmichael received this information from fellow inmates and from E.K. McDaniel, the Warden of ESP. Dkt. 113, pp. 22-23. According to a memo from Warden McDaniel dated March 23, 2007, Mr. Carmichael was placed in restricting housing, "because it [was] believed that [his] safety would be in danger if placed in less restrictive housing." Dkt. 113, p. 62. In his declaration, Christopher Jernigan stated that Mr. Carmichael had no problems with anyone prior to the claims made by Mr. Curtis and the "Gang Investigator from Washington," and that NDOC officials refused to allow Mr. Carmichael back into the workers unit because they believe Mr. Carmichael's life was in danger from the rumors that were flying around in late 2004 and early 2005. Dkt. 113, pp. 51-52.

It is also undisputed that prior to Defendant Riley's meeting with Mr. Carmichael in 2004, Mr. Carmichael lived in the least restrictive housing unit at ESP, enjoyed a prison job, educational opportunities, and a positive reputation among prisoners. Dkt. 113, pp. 18, 51. Rumors regarding the Plaintiff started circulating in 2004 with the arrival of contract prisoners. Those rumors increased in March 2005 with copies of James Curtis's web site coming into the hands of NDOC inmates. The Plaintiff was told his safety was in jeopardy in March 2005. He

REPORT AND RECOMMENDATION - 13

was placed in segregation on July 1, 2005 and has not been allowed to return to general population because his life is in danger.

It is also undisputed that Defendant Riley disclosed Mr. Carmichael's previous stint in protective custody (which occurred in 1983) to NDOC official Clark. Dkt. 111-2, p. 36; Dkt. 66, p. 6. However, there is no evidence that, in disclosing this information to Mr. Clark, Defendant Riley provided the additional explanation that Mr. Carmichael's previous protective custody status was part of a ruse leading to a successful escape attempt.

Defendant Riley acknowledges that he is "aware of the dangers to inmates if they are labeled as being a snitch," and that "[i]nmates labeled as such can be the target of violence by other offenders. Dkt. 111, p. 10.

Based on the foregoing, the undersigned concludes that Mr. Carmichael has set forth specific facts from which it may be concluded that Defendant Riley is the source of rumors that threatened Mr. Carmichael's life. Defendant Riley disputes that he is the source. Thus, there is a genuine issue for trial.

**B.    Actual Injury**

Defendant argues that Mr. Carmichael has failed to show an actual injury as required by 42 U.S.C. § 1997e(e) and, therefore, Defendant Riley is entitled to judgment as a matter of law. Dkt. 111, p. 7. In support of this argument, Defendant Riley relies on Mr. Carmichael's responses in discovery where he states he has not been assaulted or threatened by any other individual and where he failed to provide names of prison inmates who had threatened him. Dkt. 111, p. 7 (citing Dkt. 111-2, pp. 12-14). In addition, Defendant Riley argues that although staff in the Nevada institution offered to transfer Mr. Carmichael to a more secure, safe unit, Mr.

Carmichael opted to remain in general population to "take care" of things himself. *Id*., pp. 17-18.[6]

Section 1997e(e) provides in part that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." This section only limits the relief to which plaintiffs are entitled, it does not restrict their access to the courts to press claims for which the substantive law provides an underpinning. *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997). Section 1997e(e) applies only to claims for mental and emotional injury. *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002). To the extent Plaintiff's claims for compensatory, nominal, punitive (and declaratory or injunctive) relief are premised on alleged constitutional violations, and not on emotional or mental distress suffered as a result of those violations, Section 1997e(e) does not apply and those claims are not barred. *Id*.; see also, *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998) (holding section 1997e(e) does not apply to First Amendment claims); *Royal v. Kautzky*, 375 F.3d 720723 (8th Cir. 2004)(and cases cited therein) (injunctive and declaratory relief are also available under Section 1997e(e)).

Plaintiff need not show that he was actually threatened or physically injured by inmates on account of being labeled a "snitch." *See Valandingham*, 866 F.2d at 1139. The Supreme Court has rejected the notion that the Eighth Amendment does not reach official conduct that "is sure or very likely to cause" serious injury at the hands of other inmates. *Helling v. McKinney*,

---

[6]Mr. Carmichael acknowledges that he opposed going into segregation and signed a waiver indicating that NDOC would not be responsible for him if something happened. *Id.* However, it is unclear from the record when this occurred. The available evidence indicates that NDOC officials learned of a threat to Mr. Carmichael's life by the Aryan Warriors in March of 2005 and on July 1, 2005, Plaintiff was removed from the general population, placed in "restrictive housing," and has remained there since. Dkt. 66, pp. 10-11; Dkt. 113, p. 62; Dkt. 113, p. 23.

509 U.S. 25, 33 (1993). An inmate does not have to wait until he is actually assaulted before obtaining relief. *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980).

As noted above, Mr. Carmichael has presented undisputed evidence from multiple sources, including the Warden of the Ely State Prison, that he faced a real threat to his life. Whether Defendant Riley was the source of the rumors remains a material question of fact.

The undisputed evidence before the court is that Mr. Carmichael was placed in restrictive housing in 2005 and has remained there since, "because it is believed that [his] safety would be in danger if placed in less restrictive housing." Dkt. 113, p. 62. Warden McDaniel wrote this in response to a letter from Mr. Carmichael asking for confirmation, for use in litigation, that his "life was in danger from the Aryan Warrior (AW) prison group." *Id*.

Based on the foregoing evidence, the trier of fact may infer that Mr. Carmichael faced a very real threat to his life. Accordingly, the undersigned recommends that Defendant's motion for summary judgment on the issue of actual injury be denied.

C. **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson*, at 815. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540

U.S. 551, 567 (2004). In resolving whether a government official's qualified immunity claim, a court need not first determine whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right. *Pearson* at 821-22.

Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. *Id.* at 648. The qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Plaintiff bears the burden of proving that the specific right claimed was clearly established at the time of the alleged misconduct. *Davis v. Scherer*, 468 U.S. 183, 197 (1984). "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Defendant argues that he is entitled to qualified immunity because "a reasonable prison official could have concluded that providing information regarding prison gangs and inmates that are members of those gangs to other prison officials would not violate the law." Dkt. 111, p. 15. Defendant argues that the specific issue here is whether "Mr. Riley was reasonable in providing information regarding the Plaintiff to prison officials where he was housed." Dkt. 114, p. 8. In support, Defendant Riley argues that his actions were reasonable "in light of who the inmate was and the information being shared." *Id*. In addition, he states that as an investigator, he shares information about inmates with other investigators, specifically when an inmate is a confirmed member of a security threat group and the information can help the investigator or facility better

manage the inmate.  *Id.*  According to Defendant Riley, he told Officer Clark [in Nevada] that Mr. Carmichael had once been on protective custody status, and he had no reason to believe that Officer Clark would tell inmates about the Plaintiff.  Dkt. 114, p. 8.

The allegations in this case, however, are that Defendant Riley disclosed false information to NDOC officials and other inmates that Mr. Carmichael was an informant.  *See, e.g.,* Dkt. 66, p. 3.  There is no dispute that the law in this matter was well established at the time of Defendant Riley's conduct; labeling an inmate a snitch has the potential for great harm and may violate constitutional guarantees.  See, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138-39 (9th Cir. 1989) (reversing grant of summary judgment for defendants where inmate produced evidence tending to show prison officials called him a snitch in order to subject him to life-threatening retaliation by other inmates).  Therefore, if we accept as true Plaintiff's allegations that Defendant Riley falsely labeled him a snitch, that the label was communicated to other inmates, and that Defendant Riley was aware of the obvious danger associated with the reputation of being a snitch, clearly established law provides that Defendant Riley violated Plaintiff's constitutional rights under the Eighth Amendment.  See, e.g. *Benefield v. McDowall*, 231 F.3d 1267, 127 10th Cir. 2001).  Qualified immunity is, therefore, not available.

In addition, and as noted above, Mr. Carmichael has produced sufficient evidence from which a reasonable jury could infer that Defendant Riley falsely told NDOC officials and other inmates that Mr. Carmichael was an informant, and that Defendant Riley knew that Mr. Carmichael's safety would be threatened by the falsehood.  Thus, Mr. Carmichael has provided evidence sufficient to raise material issues of fact as to whether Defendant Riley violated his Eighth Amendment rights.  Resolution of these issues must, therefore, be left to a jury.

Based on the foregoing, the undersigned recommends that Defendant's motion for summary judgment on the grounds that he is entitled to qualified immunity be denied.

**D.      Injunctive Relief**

In his complaint, Mr. Carmichael sought the following injunctive relief:

> (1)      That Defendant Riley be enjoined from overseeing, participating in, or discussing Plaintiff or his history with any correctional staff or officials within or out of the state of Washington Department of Corrections, and specifically and especially any information designed to harm Plaintiff's reputation, character or person, or that a reasonable person would know would cause such in the prison setting; and further, that Defendant Riley be enjoined from ever discussing or mentioning anything about Plaintiff with other prisoners;
>
> (2)      That the Washington Department of Corrections transfer Plaintiff to another state where he can program in a general population setting.
>
> (3)      An order that the Washington Department of corrections provide an official declaration to Plaintiff that Plaintiff has never debriefed, has never been an information for the DOC, and has never been known to cooperate against other prisoners in any way, and that the few month stint on administrative protective custody in 1983 was concluded as part of an escape plot at the time of the escape in 1983.  Further, that any claims to the contrary on this paragraph is false and fabricated information designed to cause harm to Plaintiff.

Dkt. 16, pp. 18-19.

Mr. Carmichael concedes that the WDOC no longer has authority to transfer him to a safer prison facility, and injunctive relief with respect to the WDOC is moot.  Dkt. 112, p. 20.  Therefore, Defendant Riley's motion for summary judgment on this issue should be granted.

Mr. Carmichael argues, however, that summary judgment is not warranted on his claim for injunctive relief as to Defendant Riley.  Dkt. 112, p. 20.  Defendant Riley argues that Mr. Carmichael is not entitled to the injunctive relief he seeks because Defendant Riley has no

REPORT AND RECOMMENDATION - 19

contact with Mr. Carmichael and because Mr. Carmichael has failed to sufficiently specify the injunctive relief he seeks and he failed to attach a proposed order pursuant to local rule 7(b)(1).

The evidence reflects that Defendant Riley travelled to ESP and contacted Mr. Carmichael in the past and there is no evidence to indicate that he cannot do so in the future. In addition, Plaintiff's allegations and summary judgment evidence indicate that his injuries also stemmed from Defendant Riley's conduct while Defendant Riley was in Washington. Thus, Defendant's claim that the injunctive relief sought is not necessary because he has no "contact" with Mr. Carmichael is without merit.

A reasonable jury could conclude that Defendant Riley falsely told NDOC officials and other inmates that Mr. Carmichael was an informant, and that Defendant Riley knew that Mr. Carmichael's safety would be threatened by statements that he is an informant. Thus, this issue must be resolved by the trier of fact. If the trier of fact concludes that Defendant Riley violated Mr. Carmichael's rights, it must then consider the appropriate relief in light of the Prison Litigation Reform Act (PLRA).[7]

Therefore, the undersigned recommends that Defendant Riley's motion for summary judgment on Plaintiff's claims for injunctive relief be denied, except as to the injunctive relief sought as to the WDOC.

---

[7] The PLRA provides that "[t]he court shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1); see also *Oluwa v. Gomez,* 133 F.3d 1237, 1239 (9th Cir.1998). In addition, the "court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. 3626 (a)(1)(A) (1996).

REPORT AND RECOMMENDATION - 20

# CONCLUSION

Defendant is not entitled to summary judgment on Mr. Carmichael's Eighth Amendment claim that Mr. Riley, with deliberate indifference to Mr. Carmichael's safety, disclosed to staff and inmates a false story that Mr. Carmichael was a Washington DOC informant with a history of living in protective custody. Accordingly, the undersigned recommends that Defendant's motion for summary judgment (Dkt. 111) be **DENIED, except as to** Plaintiff's claim for injunctive relief as to the WDOC.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **February 12, 2010**, as noted in the caption.

DATED this   25th  day of January, 2010.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 21